GEORGE SLOCOVICH *et al.*, Respondents, *against* THE ORI-ENTAL MUTUAL INSURANCE COMPANY, Appellant.

(Decided June 25th, 1885).

In an action upon a policy of marine insurance, it appeared that plaintiffs were the agents for the ship insured; that one of the plaintiffs had purchased the ship for $10,000 and had subsequently transferred her to a British subject, who in return, as owner, gave to him a mortgage on the ship for $11,000, which amount, the mortgage recited, was due to him from the mortgagor; and the mortgagor also gave him a power of attorney. No money was in fact paid, and plaintiffs retained the possession and use of the vessel, the whole transaction being a matter of form to enable plaintiffs, while retaining all the advantages of ownership, to run the ship as a British vessel. *Held*, that plaintiffs had an insurable interest in the vessel to the amount of the mortgage.

The answer in the action set up as defenses that the vessel was not destroyed by any of the perils insured against; that she was set on fire by the master at the instigation of and in collusion with plaintiffs; and that

there was a fraudulent over-valuation of the loss. The motive for the intentional destruction of the ship, as assumed by defendant, depended upon the alleged facts that the master had an interest in her and that the insurance was greatly in excess of her value; but the evidence as to these facts was conflicting, and the proof in regard to the circumstances of the fire left its cause unexplained. *Held*, that a presumption that a criminal act was done in setting fire to the vessel, although there was an opportunity for doing it, ought not to prevail over other presumptions adequate to account for the vessel taking fire; and that a finding by the jury for the plaintiffs should, under the circumstances, be sustained upon appeal.

Upon the question of the value of the vessel at the time of her destruction, a witness, who was a competent general expert as to the value of such property, testified that he had examined the vessel five or six years before, but had not kept himself informed as to her condition and value during the interval; and that he knew what the effect of ordinary wear and tear would be upon a vessel in the course of that time. During that interval the vessel had been repaired at an outlay of from $7,000 to $9,000. *Held*, that he was not competent as an expert witness to testify as to her value at the time in question.

Upon the same question, another witness testified that he had been in the business of buying and selling ships, both as owner and broker, for ten years in the port of New York and for the preceding five years in London, during which period he had bought and sold several hundred vessels; and although he had not gone on board the vessel in question, he knew, from the books of records and reports used in his business giving the standing and descriptions of all ships, by which he was always guided in buying and selling, what would be a fair market value of the vessel at the port of New York at the time of her destruction. *Held*, that he was competent to testify to such value as an expert.

Where evidence offered to establish an affirmative defense is not competent for that purpose, and is therefore excluded, although it would be admissible by way of corroboration upon a conflict of evidence afterwards arising, such exclusion is not a ground for reversing a judgment against the party offering the evidence.

A question asking a witness to give, according to his understanding of the use of the words in the business of insurance, the meaning of the words "port risk," was objected to on the ground that the meaning of those words had been settled by the Court of Appeals. *Held*, that, as it did not appear that it was intended to show that the meaning approved by the court should be qualified in any respect, the question was properly excluded.

The complaint in an action upon a policy of marine insurance upon a vessel alleged that the vessel was burned and partially destroyed by perils insured against; and a copy of the policy was annexed to and made a part of the complaint, from which it appeared that fire was one of the perils enumerated. The answer, after denying the allegations of the complaint, alleged that "the ship was burned and destroyed by fire, by and through the act and negligence of the owners thereof, and of the

plaintiffs, and with and by their knowledge, procurement and assent." *Held*, that this was setting up an affirmative defense, the burden of proving which was upon defendant.

APPEAL from a judgment of this court entered upon the verdict of a jury.

The facts are stated in the opinion.

*Albert Stickney*, for appellant.

*Sidney Chubb*, for respondents.

CHARLES P. DALY, Chief Justice.—Four grounds of defense were relied upon by the defendants : *first*, that the plaintiffs had no insurable interest in the vessel; *second*, that she was not destroyed by any of the perils insured against ; *third*, that the vessel was set on fire by the captain at the instigation of and in collusion with the plaintiffs ; and *fourth*, that there was a fraudulent overvaluation of the loss ; no one of which defenses was established to the satisfaction of the jury, who gave a verdict for the full amount claimed. A new trial is asked for on the grounds that competent evidence was excluded, that improper evidence was admitted, and that there was error in the judge refusing to charge as requested, as well as in his charging certain propositions to which the defendants took exception ; but, after going over the whole case, there is, in my opinion, no reason why a new trial should be ordered. As respects the defense, that the plaintiffs had no insurable interest in the vessel, it was shown that the plaintiff Slocovich bought her. The purchase of her by him in June, 1880, for $10,000 was proved, not only by his own testimony but by that of the ship owner and broker by whom she was sold to him. He afterwards, to use his own language, " put her under the Norwegian flag and subsequently under the British "; the latter transfer being effected by some instrument by which the title to her was placed in the name of one Edwin Hope, a British subject,

who in return as owner gave Slocovich a mortgage upon her for $11,000, which amount it was alleged in the mortgage was due to him by Hope, Hope giving him also a power of attorney, Slocovich and the plaintiffs retaining the possession and use of the vessel. No money was paid, the whole transaction as between the parties being a matter of form to enable Slocovich, while he reaped all the advantages of ownership, to run the ship as a British vessel. The mortgage bears date the 6th of March, 1883, and the insurance, which was for the amount of the mortgage, was taken out by the plaintiffs thirteen days afterwards. Whatever Slocovich or the plaintiffs may have subjected themselves to under the laws of the United States by formally putting the title of the vessel in an alien, and whilst they reaped all the benefit of ownership running her under a foreign flag, I wholly fail to see how that would operate to deprive them of all insurable interest in the vessel, and the appellants, whilst raising the objection that it would, have not pointed out how. They say that the mortgage represented no loan, debt or transaction of any kind. It represented the security upon the vessel which Slocovich was careful to obtain when he transferred the title to her to Hope, who paid nothing for her, nor agreed to pay anything except so far as it is expressed in the mortgage, but conferred all the power his formal ownership gave him upon Slocovich by a power of attorney. Upon the transaction as it existed in form between Hope and Slocovich the latter had an insurable interest to the amount of the mortgage; the mortgage in fact representing the actual interest which Slocovich had in the vessel; it being for $1,000 more than he paid for her, and which he meant to cover by the insurance. There was nothing therefore in the defense that the plaintiffs had no insurable interest in the ship.

The second defense, that the loss did not arise from a peril insured against, may be considered with the third defense, that the vessel was set on fire by the captain at the instigation of the plaintiffs. The whole of the defense may be expressed in a brief statement:—that the captain set fire to

the vessel in collusion with the plaintiffs, as he had an interest in her, and the insurance was greatly in excess of her value. This being assumed as a motive for the act, the evidence which the defendants relied upon to prove it was, that upon the morning that the ship was removed from the merchant stores of Brooklyn to Staten Island, both the captain and the mate told the master rigger that they wanted him to stay on board the ship that night with his gang of men to finish his work in the morning of getting her ready for sea, as the captain was going to sail on Saturday, and that he, the master rigger, need not take anything to eat with him as he could get all he wanted on board; that the vessel was towed down about 5 o'clock that afternoon, which was Thursday, to the place where she was anchored off Staten Island; and that after she was anchored, about 6 o'clock, the captain told the master rigger to lower the boat and sent him and his men on shore; that the mate went in the boat also to go up to the city to select the seamen for the voyage, and the shipkeeper and the steward went also to row the boat back; that the boat was away about twenty minutes, during which time the captain was alone in the vessel; that the boat returned about half-past 6; that the captain, the steward and the shipkeeper remained on board; and that between 8 and 9 o'clock the ship was discovered to be on fire. This, together with the acts of the captain after the fire broke out up to the destruction of the vessel, together with what took place at the interview between the plaintiff Slocovich and the captain on the morning after the fire, was what the defendants relied upon, and which failed to satisfy the jury that the vessel was destroyed intentionally by the captain in collusion with the plaintiffs; and after reading the whole of the voluminous evidence in the case the impression left upon my mind is that the verdict was right.

As respects the assumed motive for an intentional destruction of the ship, that is, that she was insured for more than her value, experts as numerous and as competent as those called by the insurance company testified that she was

worth more than the amount of the insurance. She was insured for $11,000. Wright, who sold her to Slocovich, considered her worth at that time $15,000; in selling her for $10,000 he said he had lost $5,000 upon her to get rid of her, as he saw the forthcoming decline in American vessels and, as he said, did not then believe in ships. At the time of this sale the vessel had just returned from Antwerp much injured by stress of weather, which involved the necessity of extensive repairs, and Slocovich, after the purchase, repaired her at the expense of at least $7,000, making the cost of her to him altogether $17,000, being $1,000 more than the amount at which she was valued in the policy three years afterwards. The defendants called three witnesses who valued her at the time of her destruction as follows: Spence, who was a marine surveyor, at from $6,700 to $7,000; Hoyt, who was a marine inspector and had formerly been a shipbuilder, put her value at $5,000; and Glover, who was a marine inspector, put it at from $5,000 to $6,000. This was very much below both what she cost Slocovich and the amount for which she was insured; but the plaintiffs called four experts who put a much higher valuation upon her. Wright, a ship broker and ship owner, valued her at $10 per ton, which would be from $13,000 to $14,000; Zittlase, a stevedore, who had loaded her, who knew her well, and who had formerly been a shipbuilder and ship owner, valued her much higher, that is, at $14 per ton; Bernsee, a marine inspector, valued her at $10 a ton, or over $13,000; and Boyerson, a ship broker, at from $10 to $15 a ton, making his lowest valuation $13,000, or $2,000 more than the insurance, which was $11,000. The experts of the defendants were either marine inspectors or surveyors, whilst three of the plaintiffs' four experts, were ship brokers, whose business it was to buy and sell vessels, and who consequently may be assumed to have been more familiar with the value of vessels than the class of experts called by the defendants. The captain testified that he had not, and never had had, any interest in the vessel; but admitted that when he engaged the mate

he said to him, "Now you have to be very economical
on this ship; save everything you can, because I am inter-
ested in her," but it was not, he said, a fact that he had any
interest, nor was there any other evidence showing or tend-
ing to show that he had. The question, therefore, upon
this evidence, whether, there was any such motive for the
destruction of the vessel as the defendants assumed, was
exclusively one for the jury, and there is, in my opinion, a
preponderance of evidence upon this point in favor of their
finding. During the twenty minutes that the captain was
alone in the vessel he might, it is true, have arranged for
the conflagration that took place two hours afterwards. But
a presumption like this, that a criminal act was done be-
cause there was an opportunity for doing it, should not pre-
vail where other presumptions may be indulged in which
are adequate to account for the vessel's taking fire. She
had been employed for some time in carrying petroleum,
and her timbers were saturated with oil. Permeated thus
with an inflammable substance, she was especially liable to
ignition from slight or sudden cause, or from spontaneous
combustion. An instance was given in evidence of a vessel
in this city in 1869 which had carried a great many cargoes
of oil, being placed upon the dry dock for repairs, that sud-
denly took fire whilst thirty carpenters were at work upon
her, from, as it was supposed, spontaneous combustion. The
witness who upon the trial gave an account of this incident
was engaged in the hold with the port warden and the cap-
tain in a marine survey of the ship, and whilst some ballast
was being removed to facilitate the examination of her, she
was, he said, suddenly found to be " all afire " down in the
hold; that instantaneously the cabin was filled with " an
intense blackness," and when the witness and other parties
were rapidly making their way to the deck to escape, the
flames were coming up the cabin steps, as the parties escap-
ing ascended by them. It further appeared that the riggers
had been down in the hold during the day, and that whilst
on board they smoked a great deal. The captain testified
that it was not an unusual thing for vessels carrying petro-

Slocovich v. Oriental Mutual Ins. Co.

leum and saturated with oil to catch fire without a known cause, or from spontaneous combustion ; that it could even happen by letting go the anchor. The riggers whilst on board, he said, smoked very often ; that they were down in the hold to get the anchor chains ready to drop the anchor, and that four tons of coal were lying around the anchor ; that the mate was a heavy smoker, and that it was the habit of the captain " to smoke pretty nearly all day." When all these circumstances are considered it was, in my judgment, a more reasonable course for the jury to come to the conclusion that the cause of the fire stood unexplained by the evidence, than that the cause of it was the master's setting fire to the vessel.

As respects the further defense that the value of $16,000 in the policy was excessive, and known to be so by the plaintiffs, it is sufficient to refer to the evidence heretofore recapitulated on the subject of value to show that there was testimony that the vessel was worth $16,000, and that three years before she had cost Slocovich more than that amount. This was a question therefore exclusively for the jury, upon which they have found in favor of the plaintiffs.

The other questions relate to the admission and exclusion of evidence, the judge's charge, and the request to charge.

There was a material difference between the competency of the expert Martin and of Boyerson to prove the value of the vessel in the port of New York at the time of her destruction. Martin was a marine surveyor, a part of whose general business it was, when called upon, to make adjustments of general average, involving the proportion which the value of the vessel had to bear upon such adjustments, and who made from 60 to 70 of them in the course of a year. It was a business which required him to keep himself thoroughly informed, from reports and all other sources of information, of the value of vessels in the port of New York, and he was, as the court held, a competent general expert as to the value of such property. He had examined the vessel five or six years before the time of the trial, but had not kept himself during this interval thoroughly in-

formed as to her condition and value. He thought from his examination five or six years before, and from his experience and general knowledge, that he could form an opinion of her value at the time she was burned. The objection being taken, the judge held he was not competent to swear to what she was worth at that time, and the ruling I think was correct. During the interval that had elapsed she had been repaired at an outlay of from $7,000 to $9,000. He testified that he knew what the effect of ordinary wear and tear would be upon a vessel during the course of five or six years, but here there was something more than ordinary wear and tear, and as he did not see the vessel, and had not kept himself informed respecting her after these extensive repairs were made upon her, he was not competent to testify to her value at the particular time in question.

Boyerson, on the other hand, followed the business of buying and selling vessels, both as owner and as a ship broker. This had been his business in the port of New York for ten years and for the preceding five years in London, during which period of fifteen years he had, as he testified, " handled, bought and sold over 200 and less than 400 ships and steamboats, principally old vessels in the timber and petroleum trade," the trade in which this vessel, the Zorka, had been engaged. He had seen the Zorka in the Erie basin, but had not gone on board of her, but knew of her, however, by report—that is, from books—the American Lloyds, the Green Book and the Record Book, books that are published in reference to the standing of all ships, giving their descriptions, and which are used by the underwriters and merchants. His knowledge of her was entirely or substantially confined to the information that he got from the general records used in his business and reports made, by which he was always guided in buying or selling ships. He testified that he knew what would be a fair market value of the Zorka in the port of New York during the months of March and April, 1883, and the buying and selling of vessels being his especial business, he was allowed under the defendants' exception, and I think properly, to testify

to the value of the Zorka at that time, which he did by a very intelligent and discriminating answer, that in itself tended still more to show his competency. Neither the exclusion of the testimony of the one expert, therefore, nor the admission of that of the other, afford any ground, in my opinion, for ordering a new trial.

After the master rigger, Martin Thorson, had testified that the captain and the mate told him to remain on board the vessel over night, so as to get the ship ready for sea in the morning, the defendants called as their next witness one of the riggers, Sam Thorson, and asked him if the master rigger said anything to him, or gave any directions during the day, as to whether he was to stay on board of the vessel or not, which being objected to by the plaintiffs was excluded and the defendants excepted, and he was further asked what was his understanding as he got it from the other men on board of the ship, as to whether he was to stay on board all night, which being likewise objected to was excluded under a like exception. It is insisted that it was error not to admit this evidence ; that upon the question whether the fire was accidental, or was caused by the captain at the instigation of the plaintiffs, one of the most material circumstances was the captain sending away the riggers shortly before the fire broke out, and as the captain denied that he told Martin Thorson, the master rigger, to stay on board that night with his men, it was, it is insisted upon " this conflict of evidence, admissible for the defense to give this as corroborative evidence, as a part of the *res gestæ*, evidence of the directions given by the foreman of the riggers to his men in the line of his duty." Had this evidence been offered after the captain denied that he gave any such direction to the foreman, then this testimony would, within the authority of the cases that have been cited by the appellants, have been admissible in corroboration of the statement of Thorson. But before there was any such conflict it was offered as evidence in chief to establish an affirmative defense. As such, it was not competent, and the defendants are not entitled to a new trial for

the refusal of the judge to admit it in that stage of the case.

Mr. Ogden, the vice-president of the company, was asked : " According to your understanding of the use of words in the business of insurance, what do the words, ' port risk,' mean ? " The question was objected to by the plaintiffs upon the ground that the Court of Appeals in *Nelson* v. *The Sun Mutual Ins. Co.* (71 N. Y. 453), have settled what port risk means, and the question was excluded, the defendants excepting.

In that case it was shown by the evidence what is meant by these words in the business of insurance as a technical term, and the exposition there given having been approved and acted upon by the court of last resort, may and should be accepted as the meaning, unless it can be shown that it is different, or that the meaning there given is too limited or too general, or should in any other respect be qualified ; and as nothing of this kind was offered, we cannot assume that the defendants sustained any injury by not having been allowed to ask this question. If it were asked to show what was conceded to be the meaning it was unnecessary, and if it were intended to show that the meaning was different, or should be qualified, the court should have been so informed.

The judge was correct in charging that the defendants had the affirmative of the issue presented by the answer, and " were bound to establish the same by a fair preponderance of evidence." The language of the policy is : " Touching the adventures and perils which the said Orient Insurance Company is contented to bear and takes upon itself in this voyage, they are," and then follows an enumeration of the perils, one of which is " fires." The complaint was that the vessel, whilst lying at anchor in the port of New York, was burned and partially destroyed by perils insured against. This is denied in the answer, and upon this traverse all that the plaintiffs had to prove to establish a cause of action was the destruction of the vessel by fire. The defendants' answer went beyond this general traverse, and alleged, upon information and belief, that " the ship was burned, and de-

stroyed by fire, by and through the act and negligence of the owners thereof, and of the plaintiffs, and with and by their knowledge, procurement and assent." This was setting up an affirmative defense, the obligation of proving which was upon the defendants. They were the party, in the language of Chief Justice CHURCH in *Hineman* v. *Heard* (61 N. Y. 448), alleging the fact which constituted the issue created by the plaintiffs' reply to the defendants' answer. It may be in reference to a defense of this kind that such a case may be made out by direct proof as to impose upon the insured the burden of removing the conclusion which it justifies by counter-evidence. But this was not such a case. What was relied upon here was a mere probability, and not direct evidence of any criminal act on the part of the captain or the owners. This view disposes of the first and second requests to charge as respects the burden of proof, and of the defendants' exception to the ruling of the judge at the plaintiffs' request upon the close of the charge. The third request was properly denied upon the ground stated by the judge that there was no proof that the captain had any interest as owner, or part owner, of the vessel, as was also the fourth request, for the same reason.

The judgment should be affirmed.

ALLEN, J., concurred.

Judgment affirmed.